THE SANITARY DISTRICT OF CHICAGO, Appellant, *vs.* THE CHICAGO AND ALTON RAILROAD COMPANY *et al.* Appellees.

*Opinion filed February 17, 1915—Rehearing denied April 7, 1915.*

1. SANITARY DISTRICTS—*damages on condemnation by district not limited to actual value of property taken.* The fact that the Sanitary District of Chicago may have been organized under the police power of the State for the purpose of protecting the public health, does not, in case the district condemns a right of way for a channel across the property of a railroad company, limit the company's damages to the value of the property actually taken.

2. SAME—*a railroad company not compelled to pay for bridge over a channel to be constructed by sanitary district.* Neither by the common law nor by statute is a railroad company obliged to construct, at its own expense, a bridge over an artificial channel which the Sanitary District of Chicago is proposing to construct across the railroad right of way, but the cost of such bridge is properly allowed as damages in a proceeding by the district to condemn the right of way for such channel.

3. SAME—*statute construed requiring railroad company to "restore" any canal, stream or water-course.* Clause 5 of section 19 of the general Railroads act, requiring a railroad company constructing its road across any stream, water-course, highway or canal to "restore" the same to its former state so as not to impair its usefulness, has reference to streams, water-courses, highways and canals in existence at the time the railroad was constructed.

4. SAME—*Sanitary District act contemplates that district shall be accountable for all damages in condemning land.* The Sanitary District act clearly shows an intention on the part of the legislature to hold the Sanitary District of Chicago to a strict accountability for all damages inflicted by it upon any property, whether

owned by private interests or the public, and to require it, in case of condemnation, to pay full compensation for property actually taken and damages to the remainder.

5. SAME—*what properly allowed as compensation to a railroad company in condemning right of way for channel.* In a proceeding by the Sanitary District of Chicago to condemn a right of way across the tracks of a railroad company for a channel proposed to be constructed by the district, it is proper to allow as compensation the value of the property actually to be taken, together with damages, consisting of the cost of building a suitable bridge across the channel, the cost of necessary raising of the grade of the tracks, the capitalized cost of maintenance and repair of the bridge, and the expense of diverting traffic during the period of construction.

6. SAME—*when railroad company not entitled to recover cost of a four-track bridge as damages.* In estimating the damages a railroad company is entitled to for bridging a channel proposed to be constructed by the Sanitary District of Chicago it is not error to limit the amount to the cost of a two-track bridge, notwithstanding it is stipulated that the proper use of the defendant's property requires four main tracks across such channel, where the defendant company does not have a four-track railroad at that point and there is no proof that it has plans for a four-track road there.

7. SAME—*police power of the Sanitary District of Chicago depends upon the act creating it.* The police power of the Sanitary District of Chicago depends upon the charter powers granted by the legislature in the act creating the district.

APPEAL from the Circuit Court of Cook county; the Hon. JESSE A. BALDWIN, Judge, presiding.

EDMUND D. ADCOCK, JAMES S. HANDY, and OSCAR H. OLSEN, for appellant.

WINSTON, PAYNE, STRAWN & SHAW, (SILAS H. STRAWN, and WALTER H. JACOBS, of counsel,) for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is an appeal by the Sanitary District of Chicago from the judgment of the circuit court of Cook county in a condemnation proceeding brought by said district against

the Chicago and Alton Railroad Company and others, to condemn a right of way and easement for a channel for said district crossing the railroad right of way of said railroad company. The case was tried on a stipulation of facts before the court without a jury, and a judgment was entered in behalf of appellees for $53,476.

Under the authority granted to it by the legislature, the Sanitary District of Chicago has laid out and established a right of way for a channel extending from a point on the Little Calumet river, near Blue Island, Cook county, Illinois, to the main channel of the district at or near the Sag. The proposed channel intersects the right of way of the Chicago and Alton Railroad Company near Lambert station, in the same county. The right of way of the district at that point is approximately two hundred feet in width, and the record shows that the district intends to construct a channel which at the point of the proposed crossing is one hundred feet in width. So constructed, the channel will occupy permanently about that width of the right of way, necessitating the construction of a bridge to carry the railroad tracks over said channel and the elevation of the railroad right of way on each side of the bridge to the grade necessary to allow the crossing of the bridge above said channel. When the channel is completed it will connect Lake Michigan, through the Little Calumet and Grand Calumet rivers, with the main channel of the sanitary district. The Calumet feeder of the Illinois and Michigan canal extends from the Calumet river near Blue Island to the Illinois and Michigan canal at or near the Sag, and is practically parallel with the proposed Sag channel of the sanitary district. Where said feeder crosses the Alton right of way the railroad bridge maintained by said railroad is about three hundred feet from the point where the Sag channel will cross said railroad right of way. When said sanitary district channel is completed it will entirely drain the Calumet feeder and the territory tributary thereto, and

the feeder thereafter will serve no purpose. This feeder, since its construction, has been considered, in law, as part and parcel of the Illinois and Michigan canal. (Laws of 1838-39, sec. 15, p. 177.) Said feeder was not a natural water-course but was artificially constructed previous to the building of the appellee railroad, said railroad building and maintaining at its own expense a railroad bridge over said feeder at this point. The court, in entering its judgment against the appellant, included as the value of the property actually taken and damage to the remainder, the following amounts:

"Property actually taken.............................. $100.00
Cost of construction of bridge over channel to carry
    two tracks .................................... 18,778.00
Capitalized cost of maintenance and repair of such
    bridge......................................... 9,163.00
Cost of raising grade of two existing main tracks on
    each side of the bridge......................... 11,985.00
Expense of diverting traffic during the period of con-
    struction...................................... 13,450.00

$53,476.00"

In the stipulation of facts it is stated "that the proper operation of the Chicago and Alton Railroad Company's railroad between Chicago, Illinois, and Joliet, Illinois, requires the use by said company of four main tracks across said proposed channel at the point aforesaid," etc. Appellees therefore claim as damages the cost of a bridge for four main tracks and an allowance for the perpetual maintenance and repair of a four-track bridge. The appellee railroad company has only two main tracks constructed and in operation at the present time at this point, and the court refused to allow for the construction and maintenance of a bridge for more than that number. Appellees have filed cross-errors questioning the correctness of this ruling of the court, while appellant insists that under the law the only damage that should have been allowed was the $100 for the property actually taken.

Counsel for appellant contend that this court has held that the Sanitary District of Chicago was organized to preserve health and to protect life, (*Wilson* v. *Board of Trustees,* 133 Ill. 443; *People* v. *Nelson,* 133 id. 565; *Judge* v. *Bergman,* 258 id. 246;) and that the construction of this and other channels for carrying out that purpose of the sanitary district is in the interest of the public health and a regulation under the police power for the purpose of protecting the public health and life of the people, and that therefore, under the authorities in this and other jurisdictions, appellees can only recover for the actual value of the property taken.

Police power has been defined by this court as that inherent, plenary power in the State which permits it to prohibit all things hurtful to the welfare, comfort and safety of society. It "is co-extensive with self-protection, and is not inaptly termed the 'law of overruling necessity.'" (*Town of Lake View* v. *Rose Hill Cemetery Co.* 70 Ill. 191.) The extent of this power has never been defined with precision. Indeed, it cannot be accurately defined, and the courts have not been able or willing definitely to circumscribe it. (*Pumpelly* v. *Green Bay Co.* 13 Wall. 166.) It is much easier to perceive and realize the source of this power than to mark its boundaries or prescribe its limits. (*Commonwealth* v. *Alger,* 7 Cush. 53.) Notwithstanding, however, it is very broad and far-reaching, it is not without its restrictions. "It cannot be held to sanction the taking of private property for public use without making just compensation therefor, however essential this might be, for the time, to the public health, safety, etc." (*City of Chicago* v. *O'Brien,* 111 Ill. 532.) It must have some relation and be adapted to the ends sought to be accomplished. Rights of property will not be permitted to be invaded under the guise of police regulations. (*Bailey* v. *People,* 190 Ill. 28.) Every person is bound to use his property so as not to interfere with the reasonable use and enjoyment of

the property of others and not to interfere with the general welfare of the community in which he lives. This last, only, may be regulated by the police power of the State. Whatever restraints the legislature imposes upon the use and enjoyment of property within the reason and principle of this duty the owner must submit to. "It is a regulation and not a taking; an exercise of police power and not of eminent domain. But the moment the legislature passes beyond mere regulation and attempts to deprive the individual of his property, or of some substantial interest therein, under the pretense of regulation, then the act becomes one of eminent domain." (1 Lewis on Eminent Domain,—3d ed.—sec. 6.) Police power and eminent domain are distinct powers of the government. "The difference lies neither in the form nor in the purpose of taking, but in the relation which the property affected bears to the danger or evil which is to be provided against. * * * It may be said that the State takes property by eminent domain because it is useful to the public, and under the police power because it is harmful," (Freund on Police Power, sec. 511,) or, as Justice Bradley has put it, because "the property itself is the cause of the public detriment." (*Davidson* v. *New Orleans,* 96 U. S. 97.) The legislature may determine when the exigency exists for the exercise of the police power, but it is for the courts to determine what are the subjects of the police power and what are reasonable regulations thereunder, and whether there is any real or substantial relation between the avowed objects of the law and the means devised therein for attaining those ends. *People* v. *Steele,* 231 Ill. 340; *City of Belleville* v. *Turnpike Co.* 234 id. 428.

Counsel for appellant argue that the appellee railroad company accepted its franchise from the State to acquire its right of way and build and operate its railroad subject to the exercise, at any and all times, by the State, of this police power for the public health, safety, morals and wel-

fare; that the exercise of this power by the State and the observance of such duty by the railroad company ever exists and continues and cannot be contracted away. Beyond question, this is the general rule. Counsel argue, further, that at common law the railroad company must at its own expense conform its road and the operation thereof to the conditions made necessary by the construction and use of works by the city or the municipality, such as public highways or canals; that this duty rests upon the railroad company regardless of statute, and applies not only to the conditions at the time the railroad was built but also to those existing thereafter. With this we cannot agree. In this and other jurisdictions it has been held that questions of this kind are frequently regulated by statute. In *Illinois Central Railroad Co.* v. *City of Bloomington*, 76 Ill. 447, this court held that where a city had laid out a street within its corporate limits across the right of way of a railroad company prior to the passage of section 8 of the present Railroad Fencing act, (the statute at that time not requiring railroads to construct and maintain crossings outside of villages,) such city could not, by ordinance, direct the railroad to construct a crossing and approaches thereto. The doctrine of that decision, under the law as it then existed, has been quoted with approval in *People* v. *Illinois Central Railroad Co.* 235 Ill. 374, and *City of Bloomington* v. *Illinois Central Railroad Co.* 154 id. 539, it being stated in this last case (p. 543) that "if either a natural person or a corporation has a right of way across lands, and the public or municipal authorities afterward locate and open a highway or street across such right of way, then there is no rule or principle of the common law that would compel such person or corporation to construct and maintain the crossing of the highway or street over the right of way, or the approaches thereto, at his or its own expense." We know of no decisions in this State that construe the rules of the common law on that question in any different way

than as just stated. The authorities cited from other juris-
dictions by counsel for appellant on this question are not
controlling here so far as they are in conflict with the rule
as thus laid down. The reasoning of such cases as *Chi-
cago, Milwaukee and St. Paul Railway Co.* v. *Minneapolis,*
115 Minn. 460, and *Chicago and Erie Railroad Co.* v. *Lud-
dington,* 175 Ind. 35, on the right of municipal authori-
ties to compel a railroad corporation to bear the expense
of building a bridge over a canal or ditch (not a natural
water-course) not in existence at the time the railroad was
constructed, are not in accord with the law in this State.
See *Kankakee and Seneca Railroad Co.* v. *Horan,* 131 Ill.
288; *Ohio and Mississippi Railway Co.* v. *Thillman,* 143
id. 127; *People* v. *Chicago and Eastern Illinois Railroad
Co.* 262 id. 492; *Chicago, Burlington and Quincy Railway
Co.* v. *People,* 212 id. 103; *Cache River Drainage District*
v. *Chicago and Eastern Illinois Railroad Co.* 264 id. 97.

Counsel for appellant further argue that section 8 of
the Railroad Fencing act, (Hurd's Stat. 1913, p. 1952,)
which requires railroad corporations to construct and main-
tain at all railroad crossings of highways and streets, cross-
ings and approaches thereto, will require the building of
this bridge, as its crossing of the railroad is in a sense a
public crossing and should be construed as coming within
the requirements of said section 8. The reasoning of this
court as to the duty of railroad corporations in building
sidewalks and lighting the streets in subways after eleva-
tion and in building approaches to viaducts over the rail-
road tracks, (*People* v. *Illinois Central Railroad Co. supra;
City of Chicago* v. *Pennsylvania Co.* 252 Ill. 185; *City of
Chicago* v. *Pittsburg, Ft. Wayne and Chicago Railway Co.*
247 id. 319;) demonstrates that such a construction can
not be put upon this section without, in effect, overruling
those decisions.

Counsel further argue that paragraph 5 of section 19
of the Railroad act, (Hurd's Stat. 1913, p. 1942,) which

requires a railroad corporation, when it constructs its railway across or upon any stream of water, water-course, etc., to "restore the stream, water-course, * * *. thus intersected or touched, to its former state, or to such a state as not unnecessarily to have impaired its usefulness," requires the railroad company to build this bridge. Obviously, we think that the use of the word "restore," in this section, indicates that the legislature intended to include thereunder only streams, canals and highways existing at the time the railroad was constructed, as the word "restore" relates to something having a previous existence. Under a somewhat similar statute this was the meaning given to that word in *Chicago, Milwaukee and St. Paul Railway Co.* v. *Milwaukee,* 72 N. W. Rep. (Wis.) 1118. See, also, *Chicago and Northwestern Railway Co.* v. *City of Chicago,* 140 Ill. 309. In view of the facts and the issues therein nothing was said in *People* v. *Illinois Central Railroad Co. supra,* that conflicts with this conclusion.

Regardless, however, of the correctness of. the conclusions heretofore reached on the legal questions discussed in this opinion, there is a further reason why it cannot be held that the appellee railroad company is required to build and maintain this bridge at its own expense. It is a general proposition of law that a municipal corporation possesses and can exercise only those powers that are granted to it in express words or are necessarily or fairly implied in the powers expressly granted and essential to the accomplishment of the declared objects and purposes of the corporation. (1 Dillon on Mun. Corp.—5th ed.—sec. 237.) What police powers a local corporation or municipality may exercise, and the manner in which they are to be enforced, will depend upon its charter, or legislative acts applicable thereto, and the general policy of the State with respect to the same. It can only exercise such powers as are fairly included in its charter grants. (3 McQuillin on Mun. Corp. sec. 894; *Judy* v. *Lashley,* 50 W. Va. 628.) The State

may delegate to local municipalities, in such measure as it may deem desirable for the best interests of the public, this power, and may resume it again when deemed expedient. (*Harmon* v. *City of Chicago,* 110 Ill. 400.) The police power of the Sanitary District of Chicago therefore depends upon its charter powers granted by the legislature by the act creating it. (Hurd's Stat. 1913, p. 357.)

Section 8 of the Sanitary District act gives the district power to acquire, "by purchase, condemnation or otherwise, any and all real and personal property, right of way and privilege, either within or without its corporate limits, that may be required for its corporate purposes," etc. Section 12 provides, among other things, for the construction of permanent and movable bridges and the operation of the latter across the channel of said district. Section 17 reads, in part, as follows: "When it shall be necessary in making any improvements which any district is authorized by this act to make, to enter upon any public property or property held for public use, such district shall have the power so to do and may acquire the necessary right of way over such property held for public use in the same manner as is above provided for acquiring private property, and may enter upon, use, widen, deepen and improve any navigable or other waters, water-ways, canal or lake: *Provided,* the public use thereof shall not be unnecessarily interrupted or interfered with, and that the same shall be restored to its former usefulness as soon as practicable," etc. Section 19 provides for the payment of damages for overflowing lands by reason of the construction of the channel of the sanitary district, including as a part of the damages the necessary attorney's fees. By amendment of 1901 (Hurd's Stat. 1913, p. 367,) provision is made for the construction by the sanitary district of bridges over any stream or river that it may be necessary to widen or deepen in carrying on the work of said sanitary district, and that after such bridges are constructed the city, village or town in which they are

situated will still have control over them. An act passed in 1903 (Hurd's Stat. 1913, p. 367,) among other things pro-vided for the construction of the present channel, and the use of the Calumet feeder, if necessary, in said construc-tion. Section 3 of said last mentioned act states that the channel, after being constructed, shall be navigated without payment of tolls by all water craft navigating the Illinois and Michigan canal.

Manifestly, from these sections, read in connection with the remaining portion of these acts, the legislature intended that this municipality should be required to build bridges across the main channel and its adjuncts. It would be in-consistent, in view of this general requirement as to the con-struction of bridges by the sanitary district, if such district should be relieved from building bridges when its channel crosses railroad rights of way. Under the present wording of the statute it would be most unreasonable to put such a construction upon this act. This court has said that no other kind of a municipal corporation in this State has such extensive powers as does a sanitary district organized under this act. (*Gentleman* v. *Sanitary District of Chi-cago,* 260 Ill. 317.) Every provision of the act bearing on this question shows that it was the intention of the legis-lature to hold the sanitary district to a strict accountability for all damages inflicted by it upon any property, whether owned by private interests or the public, and to require it to pay full compensation for property actually taken and for damages to the remainder.

This court has had occasion several times to construe certain provisions of the Sanitary District act which have a greater or less bearing on the question here under con-sideration. In *Lussem* v. *Sanitary District of Chicago,* 192 Ill. 404, it was held that the sanitary district had authority to build new bridges across the Chicago river, made neces-sary by widening the river. In *Beidler* v. *Sanitary District of Chicago,* 211 Ill. 628, the court held that damage caused

to adjacent property by lowering the water level on dock canals on the south branch of the Chicago river through the construction of the sanitary district channel was damage to private property for public use, for which the constitution guaranteed compensation. In that case counsel for the sanitary district relied upon the doctrine of police power as a defense, arguing that as the sanitary district had been delegated power by the State for the building of this canal for preserving and safeguarding public health, under such power it was not liable for such damages. In *Pittsburg, Ft. Wayne and Chicago Railway Co.* v. *Sanitary District of Chicago,* 218 Ill. 286, (the same case was also before this court in 216 Ill. 575,) the court affirmed a judgment in favor of the railway company for over a million dollars in a condemnation proceeding, where the sanitary district acquired, by condemnation, the right to some of the property of the railway company, including tracks which were a part of its freight and passenger terminal, in order that it might deepen and widen the Chicago river. It was there held that the sanitary district had the power to condemn property for public use, not only under section 17 of the Sanitary District act, but also under section 8 of the said act.

It is conceded by counsel for the sanitary district that heretofore the district has built all the bridges for railroad corporations where similar crossings of the railroad right of way have been made by the channel of the sanitary district as proposed to be made in this case, and that never before this case has the right or duty of the sanitary district so to do been questioned. Indeed, it is apparent from the briefs of counsel for the sanitary district in some of the cases heretofore cited, that they have argued in favor of the right and duty of the sanitary district to build such bridges. Furthermore, to hold as now contended for by counsel for the district would be to practically overrule the decisions of this court last cited, and decide that the mil-

lions of dollars shown by those decisions to have been spent by the sanitary district heretofore in constructing bridges for railroad corporations under like circumstances to those here presented have been expended contrary to law. The legislature obviously did not intend to make the Sanitary District of Chicago, under this law, a favored municipality in questions of this kind. To uphold the argument of counsel in this case would be to place such municipality in a most favored position as compared with other municipal corporations.

Under clause 89 of section 1 of article 5 of the general City and Village act, it is provided that the city council "shall have power, by condemnation or otherwise, to extend any street, alley or highway over or across, or to construct any sewer under or through any railroad track, right of way, or land of any railroad company (within the corporate limits); but where no compensation is made to such railroad company the city shall restore such railroad track, right of way or land to its former state, or in a sufficient manner not to have impaired its usefulness." Under this section this court has repeatedly held that a·municipality, in condemning the right of way for any of these purposes across a railroad track or right of way, must pay actual damages for the same, except that it was relieved, under section 8 of the Railroad Fencing act, heretofore referred to, from paying the expense of grading and planking the right of way at railroad crossings. (*Chicago, Burlington and Quincy Railroad Co.* v. *City of Chicago,* 149 Ill. 457; *Chicago and Alton Railroad Co.* v. *City of Pontiac,* 169 id. 155.) In construing this provision of the City and Village act the Supreme Court of the United States, in *Chicago, Burlington and Quincy Railroad Co.* v. *Chicago,* 166 U. S. 226, held, that "while the city was bound to make compensation for that which was actually taken, it cannot be required to compensate the defendant for obeying lawful

regulations" laid down by the Railroad Fencing act for fencing and planking crossings. In *Bradbury* v. *Drainage District,* 236 Ill. 36, this court held that a drainage district, under the powers granted by the Levee Drainage act, must pay damages for causing lands to be flooded by the construction of a levee built by the district to assist in draining the lands within the district; that said district was not relieved from paying such damage under the doctrine of the police power. This decision on this point was quoted with approval by this court in the recent case of *People* v. *Chicago and Eastern Illinois Railroad Co. supra.*

Under the construction heretofore given to the Sanitary District act by this court, the trial court rightly allowed the damages in the court below against the sanitary district for the property of appellees taken in condemning the right of way for its channel at the Sag over and across the right of way of the appellee railroad company. Such construction is in full accord with the legislative intent as expressed in the Sanitary District statute and is in entire harmony with the general public policy of this State on this question.

Appellees contend, under their cross-errors, that as the stipulation of facts conceded that the proper operation of the appellee railroad required four main tracks at the point of the proposed crossing, appellees are entitled to damages based upon the cost of constructing and maintaining a four-track bridge. The measure of damages in a condemnation matter should be based upon the market value of the property for the best and highest use to which it is adapted, (*Ligare* v. *Chicago, Madison and Northern Railroad Co.* 166 Ill. 249,) and all facts as to the condition of the property, its surroundings, improvements and capabilities, may be shown and considered in estimating its value. But proof must be limited to showing the present condition of the property and the use to which it is naturally adapted.

It is not competent for the owner to show to what use he intended to put the property, nor what plans he had for its improvement, nor the probable future use of the property, in so far as such plans may affect the damages to be allowed. "Nothing can be allowed for damages to an intended use." (2 Lewis on Eminent Domain,—3d ed.— secs. 707, 709.) This court held in *Chicago and Evanston Railroad Co.* v. *Blake,* 116 Ill. 163, that the plans for a structure contemplated by the owner of land sought to be condemned might be received in evidence to illustrate one of the uses to which the property was adapted if its introduction was limited to that object, but that such evidence was inadmissible to enhance the damages. In later decisions, however, this court has held that a plat prepared by the defendants in a condemnation matter showing a possible object,—largely an imaginary development of the land for future use and not of any improvement the defendants contemplated making,—is not admissible. (*Sexton* v. *Stock Yard Co.* 200 Ill. 244; *Martin* v. *Chicago and Milwaukee Electric Railroad Co.* 220 id. 97.) There is no proof in this record that the railroad company had plans for a four-track railroad at this point. The only proof was that the highest and best use of the railroad right of way at this point required four main tracks. The question of what the damages might be after the construction of such four-track railway is too remote and speculative to be considered. The trial court did not err in refusing to allow damages for the cost of building and maintaining a four-track bridge.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*